Oh, yes, you all are done. Thank you. The case is now under submission. Maybe I didn't say that loud enough. Just in case we haven't had enough insurance, we'll have the next case. All right. And now we have our last case of oral argument on this panel for this week. Case number 23-30434, Patrician Mgmt v. BXS Insurance. And we have Robert Tishern for Patrician Mgmt. You can correct my name. Go ahead. Robert Tishern, on behalf of the plaintiffs' appellants, Patrician Mgmt, and also— Would you please come forward? We have to be able to hear you, and so you need the microphone. Good morning, Your Honor. Robert Tishern, along with Robin Elliott here on behalf of the plaintiffs' appellants, Patrician Mgmt, and New Orleans Navy Housing, LLC. Okay.  We're here today because the district court granted Rule 12b6, Motion to Dismiss, on the basis that appellants failed to allege sufficient facts to demonstrate a causal link between BXSI's actions and the $1.6 billion increase in the appellant's name storm deductible that was applied for Hurricane Ida. The district court ignored the less stringent 12b6 standard and applied a much harsher standard, essentially requiring plaintiffs to prove that they will be successful on the merits of the case. The name storm deductible for the plaintiff's Hurricane Ida claim was calculated based on the valuation that was performed as of the time of the loss, rather than the statement of values that was on file with the insurance company and which was procured in connection with obtaining the policy. I may have misunderstood, but I thought your opponent said the real problem, the reason why your numbers changed, was because the value of these properties went up, and that wasn't something that they assessed. Am I misreading that? You're not misreading that. I think that is accurately stated. Okay. So what's your response to that? The response is this, Your Honor. We have to look at this with a frame of reference not only in a vacuum to Hurricane Ida and that claim and that deductible calculation, but also to Hurricane Zeta, which was also subject to a similar but not identical 3% name storm deductible. The deductible provisions in the policies that were in place for both Hurricane Zeta and Hurricane Ida were identical. The only difference was that for the deductible provisions in effect at the time of Hurricane Ida, there was also a per building deductible endorsement that amended it by inserting one additional phrase. However, that one additional phrase did not change what the total insurable values was on which the 3% calculation was performed. So for the Hurricane Zeta claim, when the per building deductible endorsement had not yet amended the deductible provisions, the total insurable values was determined using the statement of values that was submitted when the insurance policy was procured. Similarly, another statement of values was submitted when the Ida policy, if you want to call it that, was procured. That statement of values listed the total insurable values for the properties at $112,662,000 and change. However, when the claim was made for Hurricane Ida, that $112 million figure was not used to calculate the 3% deductible. Instead, a new estimate was performed or a new valuation was performed by the insurance company to find that the total value of the property at that point in time was $169 million and change. But am I right that both policies did say it should be valued at the time of loss? They did. They did, and they also said that the total insurable values, which So if the only thing that changed in your consultation with the insurer was the per building endorsement, but that the injury to you has to do with whether or not the underwriters valued pursuant to the policy. The injury to the appellants in this case is that the deductible provision in the 3% deductible calculation was applied differently from Hurricane Ida. Yeah. But what if you got a windfall in the first one? What if the valuation was just incorrect to your benefit, the underwriters? That's an answer we don't have at present, Your Honor. However, the presumption would be that if the insurers applied the deductible provisions for Zeta one way, that they would apply those same provisions to the extent they were still in effect the same way for Hurricane Ida. That's the crux of your claim. That is the crux of it. The only difference between the two claims is that in the interim, plaintiff's appellants advised BXSI. They said we want a lower name storm deductible, and the response from BXSI was to propose this per building deductible endorsement, which simply added the words for each building involved in the loss or damage. The entirety of the remainder of the 3% deductible for the name storm, 3% name storm deductible language was identical. There were no deletions, only that one insertion. That one insertion does not change the use of 3% of total insurable values. It also does not change where it states, as Your Honor asked, at the time or rather at the time of the loss or occurrence. The only difference was that it allowed for the possibility of instead of using the total insurable values for all probably 150 plus buildings at both of these locations, it would allow for using the total insurable values for only those that were damaged. Which could have been to your benefit, but then I. It could have been, and that was the intention, and that's why Patrician and New Orleans Navy Housing paid an extra $8,000 in premiums to have that endorsement included. Their understanding was that it would benefit them possibly. It was never their understanding, and they were never advised that it was also a double-edged sword that could be to their detriment. You know, the district court cited offshore productions and then Newman School case. And looking just at the Newman School case, it's still your obligation to look at the policy language and see that valuation is at the time of loss, right? And that's precisely the point, Your Honor, because valuation at the time of the loss as it was applied for Hurricane Zeta. Unless that was an incorrect application, which again is a fact we don't know. But unless that was an incorrect application, presumably reflects the valuation, the total insurable values as documented in the statement of values on file at the time of that loss. As opposed to an insurance company going out for Hurricane Ida and conducting its own brand new valuation, finding that the properties insured are worth in excess of $50 million more than the amount on which even the premiums were based. That's the crux of it. Looking at the changes in the policy language, there should have been no difference. There was no reason the insured could have known as a layperson, not familiar with insurance, or a lay entity if you will, looking at what the per building deductible endorsement did. They acted solely on BXSI's advice that this would be to their benefit if less than all the buildings were damaged. But never were they aware that they were paying $8,000 more in order to have their deductible that was 3% be increased by $1.6 million, more than it would have been had they used just the total insurable values based on the statement of values of $112 million that was in effect at the time of Hurricane Ida. Right, but it seems like the problem isn't so much what they changed, but that the value went up, rightly or wrongly. So I'm just a little bit confused about the point you're making on that. The question, Your Honor, is why. Why did the value go up? How did that one change? Because that's the only change. That doesn't seem to be your case. Your case is they didn't tell us, la, la, la. Well, that's different from they are committing fraud on us by this increase of the value. Well, to be clear, Your Honor, it was plaintiffs or appellants do not allege that BXSI is committing fraud. They allege that there was a negligent failure to advise them of the downside. Right, but the issue was if we have just one building harmed, then that's what we want to do. We want a better deal. And you got that better deal. The problem was that this was, again, a hurricane that covered all of the buildings, so you didn't get that benefit. But I'm just struggling with, okay, what were they supposed to say, that values can go up? That's already well known. I mean, we all know this building might be valued at X today and X plus or X minus tomorrow. I mean, that's not anything new, that concept. Well, the concept of values going up was not lost on the appellants at the time when they procured that policy, in effect, at the time of Ida. In fact, they knew that the total insurable value figure, the statement of values figure, went up from $107 million to $112 million from the 2020-2021 policy to the one for the subsequent period during Hurricane Ida. They knew that there was an increase in what was deemed to be the total insurable values for the properties, and they were okay with that. They understood that if there was damage to all of them, that that would be the total insurable values figure, but it wasn't. And there was nothing in the per building deductible endorsement, or if you read it in concert with the other deductible provisions in the policy, that should have led them to be able to discern that themselves, and nor were they advised of that downside risk, that double-edged sword component of the per building deductible endorsement, that could possibly have allowed for this $50 million increase in the total insurable values and adding another $1.6 million to their name storm deductible. Just quickly, what does the record reflect the relationship is between BXS and the underwriter that did the valuation? The relationship between the two is merely that BXS was the agent that placed the policy. The underwriters acted, I guess, on their own volition in performing the valuation and in applying the deductible provisions under the Ida policy. Again, maybe I'm wrong, but if that is it, the underwriters are the one that came to the valuation number that you think is just astronomically high, but you're acknowledging it is a valuation by an underwriter at the time of loss. Absolutely. Absolutely, Your Honor. And in performing that valuation, there's evidence in the record to show that the underwriters relied on the amended language in the deductible provisions of the policy. Okay, that's important. So just describe to me what the record says, how their valuation was influenced by the per building only language change. What does the record say, the underwriter, how did they use that, other than it's not one building, it's all of them? In essence, there is communications or there are communications back and forth with the underwriters in one specific letter which states that the 3% name storm deductible for Hurricane Ida was calculated based on the name storm deductible provision as amended by the per building deductible endorsement. And on that basis, they performed the valuation and then calculated the 3% deductible at $5 million plus, instead of at $3.3 million. Okay. If there are no other questions. No, Your Honor, I think I've covered the waterfront. I'll save the remainder of my time. Okay. Actually, let me just formally conclude. I apologize. So in conclusion, what we ask of this Court is this. We ask that the Court reverse the lower court's ruling and remand this case for further proceedings in recognition of the heightened standard under offshore being applicable to this matter. In the alternative, we ask that the Court reverse the lower court's ruling and remand it and give an allowance for plaintiffs' appellants to amend their petition to further illuminate the basis on which they did sufficiently amend or assert the claims at stake here in this matter. Thank you. Okay. Thank you. And I'll save the remainder of my time for rebuttal. Yes, you saved some time for rebuttal. Thank you. And we'll now hear from Alex Rothenberg. Yes, Your Honor. Good morning, and may it please the Court. Alex Rothenberg on behalf of the appellee BXS Insurance. An insurer's valuation of properties post issuance of a policy and the effect it may have on a deductible does not create liability for an agent like BXS. Plaintiffs want to employ hindsight and hold insurance agents liable for not being able to predict the future in providing customers insurance options. This is not only an impossible standard, but one that the Louisiana Supreme Court has rejected on numerous occasions. Is it your position that the change that was made is why they lost more? Are you talking about the valuation of the properties? I'm just asking the question I just asked, because their whole case is about we ended up not getting paid as much as we would have under the prior policy. And I'm asking you if you agree with that. No, Your Honor. Okay. So please explain that. Sure. So the difference that they seize upon is this per building deductible endorsement. All that the endorsement does not modify how the individual buildings on the insured properties are valued or appraised. All that the deductible does is modify which buildings will be included in the calculation for the named storm deductible. So under policy one, which did not include this at issue endorsement, when there was a named storm claim, the total value of the insured property was used to calculate the named storm deductible. The endorsement says now only the buildings that are damaged will be used in that named storm deductible calculation. So if you have ten buildings and only two are damaged, your deductible is based upon the value at the time of the loss. So it would have been better if only a few buildings had been damaged, but then since they all were, it didn't change that.  Is that what you're saying? And then the value, the argument that your opponent made towards the end was that essentially you wrote the underwriters kind of like telling them, okay, raise the value of these properties. Is that correct? That's not a correct characterization of the record, for sure. And I believe what the documents that plaintiffs are alleging are documents that they presented post Judge Fallon's order of dismissal trying to amend and say there's this evidence. The documents on their face don't, we would, one, object because they're not in the record in that they were post-judgment, but they also don't show what plaintiffs claim they do. They just list statements of values. They never say this is what should be used in the valuation of the properties at the time of the loss. And that's kind of the red herring with this statement of values argument. The policy one without the endorsement and policy two with the endorsement are the same in that the statement of values is not what dictates the total insurable values at the time of the loss. It is the value at the time of the loss. So Judge Higginson, I think to your point, they may have incurred a windfall with regard to their Hurricane Zeta claim. And if the underwriters used the statement of values with regard to policy one in determining the name storm deductible, maybe the values hadn't changed or maybe the underwriters made a mistake in applying the policy in that circumstance. But the policy is very clear, one and two, about what is used and what is the proper value for a name storm deductible. And that just has no relationship or it is not in and of itself the statement of values. So that argument, I think, really doesn't hold water. It also doesn't implicate a duty that would be owed by an insurance agent under Louisiana law. But you're comfortable even under offshore productions? Correct, Your Honor. You're not a, quote, mere order taker. You need to sort of assess their needs and say, when you realize, I guess maybe you'd still say, this is still to your benefit. You don't back off this per building thing. Sure. There's a couple points on offshore. At its broadest, offshore production stands for the principle that if an insurance agent has a specialized area of expertise in the customer's business, that they have some heightened duty to provide more tailored or specific coverage options. There's no allegation that BXS has that type of specialized expertise in their area of business. And frankly, that type of argument doesn't really make sense within the context of this dispute. Plaintiffs are complaining that they paid a deductible higher than what they would have liked. I think any insured wants to pay as low as they can with the coverage they want. So this is not really a specialized coverage option taking into account plaintiff's unique business needs. But second, to the extent offshore has been interpreted in the wake of Isidore Newman, courts have been very clear that it really only stands for if there is an affirmative request for specialized coverage, that then maybe an insurance agent has an obligation to help pair them with that. And again, the petition does not allege any special request. They said they wanted lower deductible. And then because the valuation goes so high, deductible is allowed. Well, sure. They say that now, but if you look at the actual allegations of the petition, what is alleged is that BXS approaches them about this deductible and says, we would recommend this in the event of a smaller loss, this will save you money. And I do want to make clear, higher and lower are relative terms. You have to ask higher or lower relative to what? And it is not with what you paid prior. It's what you would pay absent this endorsement. So for the Hurricane Ida claim, the benefits of the endorsement were more or less mooted because all their buildings were damaged. But had they experienced half the buildings damaged instead of all of them, their deductible would have been lower because only the value of those buildings would have been included.  Part of the calculation of the name storm deductible is the valuation at the time of the property. No one can predict that. So if the property value is double, you might have paid what you paid for the Hurricane Zeta claim. My last question that comes to mind is could you speak to what the record reflects the relationship is between the underwriter that did the valuation and BXS? There is no ‑‑ I don't believe there's anything in the record regarding a connection. Okay, I can expand beyond that. What is it typically? I mean, in this instance, they're separate. There's no connection necessarily between an agent and an insurer. Is there any indication in their pleading that there is a connection? No, Your Honor, and I believe, as counsel for appellants said here, that there's no allegation of fraud or malfeasance. So I don't believe that's an issue in this case. But just more thematically, and I think that gets to the core of this, what plaintiffs are really ‑‑ you know, insurance is a hedge of sorts. It's an attempt to manage risk and mitigate that. But ultimately, that's a business decision, and no one, not the customer, the insurance agent, or the insurer can predict what coverage with hindsight would be the most beneficial. You can pay an increased premium on a policy to get a lower deductible, but then if you don't have claims within that year, with hindsight, it might have been more beneficial to opt for a lower policy. You can have a policy with a lower premium and a higher deductible, and then you might have a ton of claims, and in hindsight, the opposite would have been true. This endorsement is no different. They paid, you know, with the hope that if we have a smaller loss, that we're not going to be stuck with the deductible that's based upon the entirety, you know, the total insurable values. But there's certainly awareness in New Orleans that you can have all your buildings damaged. Certainly, but there's really no damage from that. And a point we make in our briefing, and I'll reiterate today, they're no worse off because of the endorsement, absent, I guess, the cost of the endorsement, but their deductible, if Policy 2 did not have the per building deductible endorsement, their name storm deductible would have been the same because, once again, the underwriters would have used the total insurable values of the properties at the time of the loss, and because all buildings were damaged, that would have been the same. Again, if there is an issue with how the underwriters valued or appraised those properties, that's an issue to take up with the underwriters. It's not an issue that creates liability for an insurance agent. All right. Anything else you want to tell us? Yes, Your Honor. I'll just make clear that the duty aspect of this has been reiterated numerous times by Isidore Newman, by this court recently in Coleman E. Adler and Sons. I've addressed offshore, and while I think it's distinguishable, I don't think it imposes a heightened duty here. I'll briefly talk about the amendment issues, and I don't think they were addressed squarely in my opponent's argument, but nothing that has been presented either in the district court post-judgment, which was the first time that plaintiffs ever provided any proposed amendments, and as Judge Fallin found, there's nothing that would bridge the gap either on causation, which is what Judge Fallin really focused on, but also on this duty aspect. And this court's precedent has been very clear that post-judgment requests for leave to amend, it is the movement's burden to show that there was no way they could have raised these issues. And we laid this out in our briefing, but under Rule 15, they had 21 days after BXS's motion to dismiss to amend. They had seven and a half months to amend while the motion was under submission before Judge Fallin, and they didn't. And now, even if the court were to overlook that, there's just simply nothing that they propose that would get them past to either show a duty that BXS violated that's owed by an insurance agent or any causal connection between the per-building deductible endorsement and the damages they claim. For all those reasons, Your Honor, I would ask that the court affirm the judgment below. Okay. Thank you. We'll now hear the rebuttal. Your Honors, this isn't a case or a claim about a gripe over a high deductible on an insurance policy. That's a fact of life in southeast Louisiana. It's not lost on any party to this case, I wouldn't imagine. This is a case about a claim or a complaint about an increased insurance deductible over and above what it would otherwise have been despite never having been advised of that by the insurance agent. That's what this case is about. Something very interesting just came up in my opposition's argument. They said that if policy two didn't have the name storm deductible, their name storm deductible for Hurricane Ida would have been the same. They also said earlier on in their argument that there was a windfall for Hurricane Zeta. And that implication from those two statements is that it's BXSI's position that all along they were aware that the methodology for determining the total insurable values under either of those policies was or should have been evaluation performed at the time of loss as opposed to using the statement of values on file. If it is BXSI's position that the Hurricane Zeta deductible was improperly calculated, therein lies the proof that they were aware and should have advised plaintiffs of the potential downside of paying $8,000 more for a per building deductible endorsement that should have reduced their name storm deductible amount. Beyond that, I would also like to address simply the fact that under the offshore case, BXS had a fiduciary duty to plaintiffs to inform them of the impacts of that per building deductible endorsement. Under the Newman case, the agents have an affirmative duty to give the insured advice regarding aspects of the policies that are not within the knowledge generally held by a layperson. All things I alluded to in my direct argument, but the fact of the matter is, on top of the position we just heard from opposing counsel, they were clearly aware and should have advised the layperson, the appellants in this matter, of the potential of the downside calculation of the per building deductible endorsement based on an on-the-spot valuation as opposed to the statement of values valuation. BXS was aware of the nature of plaintiffs' business. They were the same agent the plaintiffs had at the time when they procured the Zeta policy and when the Zeta claim was made, and they were aware of the concerns that arose from the high per building deductible, or rather non-per building deductible, 3% named storm deductible for Hurricane Zeta, and that was the basis on which plaintiffs requested and on which BXSI made a recommendation to get the per building deductible endorsement, and all of this just goes to show that the heightened standard under Offshore does, in fact, apply in this matter. On top of this, with respect to amending plaintiffs' petition, agreed, we did not amend the petition after the motion to dismiss was filed. From our vantage point, doing so would have been futile at that point. However, it was our understanding and expectation under the law that we would be permitted that opportunity to amend before the matter was dismissed, and that was an opportunity that was never provided to us, and under Smith v. BP Exploration, Eastern District of Louisiana, 2023, it's well-established law that courts should generally allow plaintiff an opportunity to amend before dismissing an action for failure to state a claim under 12 v. 6. And the amendment would be what? What would you add? In the amendment, we would just, truthfully, Your Honor, more clearly set forth that because of BXSI's knowledge of plaintiffs' concerns and requests for a lower named storm deductible, they then had a duty to plaintiffs under Offshore to make a recommendation in line with that and provide all related information connected to that recommendation, and that being the per building deductible endorsement is a double-edged sword, which was never done. That's the causal link that I think would be most helpful to further set forth the claims and clarify things for the district court to the extent it's not already clear which appellate's respectfully submit is, in fact, the case. Okay. In paragraphs 10 and 11 of their original petition. Record and appeal on, I believe it's page 11. Okay. Thank you for your rebuttal and all your arguments, both sides. Your case is under submission, and this concludes the oral argument.